IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    )
                              )    Criminal No.  2:22-cr-189
        v.            )
                              )    (18 U.S.C. § 371)
DANIEL HURT             )

## INFORMATION

The United States Attorney charges:

## COUNT ONE

At all times material to this Information:

### The Medicare Program

1.      Medicare was a federal health care program providing benefits to individuals who were 65 years of age or older and who were entitled to retirement benefits, or who were disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency that was a component of the United States Department of Health and Human Services. Individuals who receive benefits under Medicare were referred to as Medicare "beneficiaries."

2.      Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and was considered a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.      Medicare had multiple components, called "parts," including, as relevant here, Part A and Part B.   Medicare Part A covered the costs of hospital care and inpatient services, such as surgical procedures, certain medical supplies utilized in inpatient care, and certain ancillary services during an inpatient encounter.   Additionally, Medicare Part A covered limited home health services, skilled nursing facility care, and hospice care.   Medicare Part B covered the costs

of physicians' services and outpatient care, such as physical therapy, occupational therapy, and, as relevant here, laboratory testing services.

4.     As relevant to this Information, Medicare covered the cost of services billed under Part A and Part B only if, among other requirements, the relevant services were reasonable, medically necessary, and ordered by a treating physician.   Medicare would not reimburse claims for services that were neither reasonable nor medically necessary.   Likewise, Medicare would not reimburse claims for services that were procured through kickbacks or bribes.   Such claims were deemed false and fraudulent because they violated Medicare laws, regulations, and program instructions.

5.     Hospitals occasionally provided outpatient services to patients who were not admitted in an inpatient capacity at the hospital or its emergency department.   In these circumstances, hospitals were permitted to seek reimbursement through the Medicare Part A Outpatient Payment Prospective System (OPPS).   The OPPS required hospitals to submit certain outpatient medical claims through their Part A Medicare Administrative Contractor (MAC), a private health care insurer that had been awarded a Medicare contract to administer and process medical claims.   Reimbursement of such claims were paid through Medicare Part B (but at rates set for Part A reimbursements) for a variety of services, including, as relevant here, laboratory testing services.

6.     To enroll in Medicare, medical providers and suppliers, including hospitals and physicians, were required to obtain a National Provider Identifier ("NPI").   Providers were also required to submit enrollment documentation to Medicare, which included, among other things, contact information for the provider.   In addition, enrolling providers completed the CMS Form 855B, which specifically certified the following: (1) the provider agreed to abide by applicable

Medicare laws, regulations, and program instructions, including, but not limited to, the federal anti-kickback statute (42 U.S.C. § 1320a-1b(b)); (2) the provider understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (3) the provider was required to refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

7.      Under Medicare regulations, a medical provider was permitted to submit claims only for services actually rendered and was required to maintain patient records verifying the provision of services.

8.      To receive reimbursement for a covered service from Medicare, a medical provider was required to submit a claim, either electronically or in writing.   The claim was required to include information identifying the medical provider submitting the claim, the medical provider rendering the service, the referring physician, the patient, and the services rendered.   By submitting the claim, the provider certified, among other things, that each service was rendered personally by the provider or under his or her direct supervision and incident to the provider's care, and that the service was medically necessary for the health or well-being of the patient.

9.      Every Medicare claim submitted by, or on behalf of, a physician, hospital, or other health care provider, included an agreement by the provider to abide by Medicare's rules and regulations.   As a condition of payment, Medicare required providers to certify that all information on the claim was true, correct, and complete.

**Background on Ellwood City Medical Center**

10.      Ellwood Medical Center Operations, LLC, d/b/a Ellwood City Medical Center ("ECMC"), was an acute care hospital located in Ellwood City, Pennsylvania, in the Western

District of Pennsylvania.   ECMC maintained an on-site laboratory (hereinafter, "ECMC Laboratory") to perform testing for patients admitted in an inpatient or outpatient capacity.

11.     ECMC was an enrolled Medicare provider operating as an acute care hospital, or ACH—i.e., a hospital that provided inpatient medical care and other related services for surgery, acute medical conditions, or injuries.

12.     The ECMC Laboratory was known as a qualified hospital laboratory ("QHL"), a type of laboratory that provided certain clinical laboratory tests 24 hours a day, 7 days a week, to serve the hospital's emergency room.   In addition to operating as a QHL, the ECMC Laboratory acted as a so-called independent clinical laboratory, or ICL—i.e., a laboratory that performed tests for persons who were not hospital patients.   ICLs typically performed services involving the biological, microbiological, serological, chemical, immunohematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition.

13.     The ECMC Laboratory was required to be certified under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), which established a set of national standards for laboratories to ensure quality testing.   ECMC maintained an active CLIA certification.

14.     Medicare required that all procedures performed by ECMC or the ECMC Laboratory be ordered by the physician or practitioner who was treating the beneficiary; that is, the physician who was furnishing a consultation or treating a beneficiary for a specific medical problem and who used the results in the management of the beneficiary's specific medical treatment.

**Reference Laboratories**

15.     A reference laboratory arrangement existed when a laboratory received a specimen for testing and sent the specimen to another laboratory for testing, rather than testing the specimen on-site.   In this arrangement, the "referring" laboratory was the laboratory that originally received the specimen to be tested but referred the specimen to another laboratory for performance of the laboratory test.   The "reference" laboratory was the laboratory that received the specimen from the referring laboratory and performed the test.

16.     As defined in Title 42, United States Code, Section 1833(h)(5)(A), a referring laboratory was permitted to bill for tests performed by a reference laboratory so long as the referring laboratory met one of the following conditions:

    a.      The referring laboratory was located in, or was part of, a rural hospital;

    b.      The referring laboratory was wholly owned by the entity performing such test, the referring laboratory wholly owned the entity performing such test, or both the referring laboratory and the entity performing such test were wholly owned by a third entity; or

    c.      The referring laboratory did not refer more than 30 percent of the clinical laboratory tests for which it received requests for testing during the given calendar year.

17.     Medicare required the disclosure of any reference laboratory arrangement using a modifier—"90"—on the claim form.

18.     At no time was ECMC designated by CMS as a rural hospital for purposes of the restrictions concerning the use of reference laboratories, nor was it wholly owned by, or the owner of, any reference laboratory.   As such, to the extent ECMC utilized the services of a reference laboratory to perform testing, it was required to notify Medicare of such referencing on claim

forms.   Likewise, any reimbursements to ECMC for claims submitted based on services performed by reference laboratories were subject to the above-referenced 30% cap.

### Cancer Genomic (CGx) Testing

19.     Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.   CGx testing was not a method of diagnosing whether an individual presently had cancer.

20.     Medicare did not cover the costs associated with diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."   42 U.S.C. § 1395y(a)(1)(A).   Except for certain statutory exceptions not applicable here, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

21.     Where diagnostic testing was necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the costs associated with such testing.   Specifically, 42 C.F.R. § 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."   Id.   "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."   Id.

22.     Because CGx testing did not diagnose cancer, Medicare only covered the costs associated with such tests in limited circumstances, including when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment

of that cancer.   Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

23.     Where a CGx test was procured through the payment of a kickback in violation of federal law, a claim to Medicare for reimbursement for such test was fraudulent.

24.     At no time did the ECMC Laboratory maintain CLIA-certified equipment to conduct CGx testing on-site.

### Telemedicine Arrangements

25.     Telemedicine was a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to allow a doctor to interact with a patient.   Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers, who were paid a per-consult fee to conduct remote consultations with patients.

26.     Medicare Part B covered expenses for specified telemedicine services but only when certain requirements were met.   These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telemedicine consultation with a remote practitioner.

### The Defendant, Entities He Controlled, and Other Relevant Entities

27.     Defendant DANIEL HURT was a resident of the Southern District of Florida. HURT and other individuals owned, operated, and maintained financial interests in several purported consulting and clinical laboratory entities, including, among others, Verify Health

("Verify"), Sonoran Desert Pathology Associates ("Sonoran"), First Choice Laboratory LLC ("First Choice"), and Fountain Healthcare Services, LLC ("Fountain Health").

28.     Company 1 was a business entity based in the District of Colorado.

29.     Company 2 was a business entity based in the District of Maryland.

30.     Company 3 was a business entity based in the Southern District of Florida.

31.     Company 1, Company 2, and Company 3, as well as individuals operating, controlling, and acting on behalf of such entities (collectively, "Marketers"), engaged in a variety of marketing activities—including hosting "health fairs" in public places, offering "free" genetic testing at long-term care facilities, and contacting Medicare beneficiaries by phone—in order to obtain CGx specimens (i.e., cheek swabs) from Medicare beneficiaries for subsequent submission to clinical laboratories, including ECMC, for testing.

## The Conspiracy and Its Objects

32.     From in and around late 2018, through in and around October 2019, in the Western District of Pennsylvania, and elsewhere, the defendant, DANIEL HURT, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with at least one other person to commit offenses against the United States, that is:

        a.      to violate Title 18, United States Code, Section 1347, by knowingly and willfully executing, and attempting to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), that is, Medicare, in connection with the delivery of or payment for health care benefits, items and services;

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare;

c.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in party by a Federal health care program, that is Medicare;

d.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and

e.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in party by a Federal health care program, that is Medicare.

    f.  to violate Title 18, United States Code, Section 1957, by knowingly engaging and attempting to engage in monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, health care fraud.

### Purpose of the Conspiracy

33.  The purpose of the conspiracy was for HURT and others to unlawfully enrich themselves by submitting or causing the submission of false and fraudulent claims by ECMC to Medicare for CGx testing.

### Manner and Means of the Conspiracy

34.  It was a manner and means of the conspiracy that the Marketers, acting in concert with and at HURT's direction, contacted thousands of Medicare beneficiaries throughout the United States by targeting them with marketing campaigns and inducing them to submit CGx specimens by means of cheek swabs sent to the Medicare beneficiaries' homes or provided to them at purported "health fairs" held throughout the United States, among other acquisition methods.

35.  It was a further manner and means of the conspiracy that, in addition to the Marketers, HURT used individuals associated with entities that he controlled, including Sonoran, to obtain CGx specimens from Medicare beneficiaries.

36.  It was a further manner and means of the conspiracy that HURT and the Marketers worked with a network of telemedicine health care providers to obtain prescriptions for CGx testing, without regard for the fact that those providers did not conduct a proper telemedicine visit, were not treating the Medicare beneficiaries for cancer or symptoms of cancer (or for any other

condition), did not use the test results in the treatment of the beneficiaries, and generally were not qualified to understand and interpret the CGx-related test results.

37.     It was a further manner and means of the conspiracy that HURT offered and paid kickbacks to the Marketers, among others, in exchange for their efforts to cause Medicare beneficiaries to submit CGx samples to the Marketers or to ECMC in support of ECMC's subsequent claims to Medicare.

38.     It was a further manner and means of the conspiracy that although the Marketers shipped and caused to be shipped CGx specimens directly to ECMC, HURT directed ECMC staff to re-package and re-ship such specimens to reference laboratories outside the Western District of Pennsylvania because, as HURT well knew, the ECMC Laboratory did not possess CLIA-certified equipment to conduct on-site CGx testing.

39.     It was a further manner and means of the conspiracy that HURT caused ECMC to submit claims to Medicare using the ECMC Laboratory's NPI for fraudulent CGx testing in amounts regularly exceeding $12,000 per beneficiary and resulting in reimbursement amounts that sometimes exceeded $6,000 per test.

40.     It was a further manner and means of the conspiracy that HURT caused Medicare to reimburse fraudulent CGx claims despite the fact that such testing and related services were not medically necessary and knowing that such testing and services were procured through kickbacks.

41.     It was a further manner and means of the conspiracy that HURT solicited and received kickbacks from ECMC—specifically, a portion of the Medicare reimbursements paid to ECMC in connection with fraudulent CGx testing.   HURT, acting through First Choice and Fountain Health, entered into sham agreements and business arrangements with ECMC that disguised the kickbacks as purportedly legitimate payments, including payments related to

management services at the ECMC Laboratory.   In reality, as HURT well knew, the payments were based on the volume of CGx tests and the amount of resulting Medicare reimbursements, in violation of federal law and Medicare regulations.

42.   It was a further manner and means of the conspiracy that HURT used a portion of the kickback payments he received from ECMC to pay additional kickbacks to the Marketers, among others.

43.   It was a further manner and means of the conspiracy that HURT entered into sham contracts with the Marketers in order to make it appear that the Marketers were engaged in, and being paid for, legitimate marketing and referral services, when as HURT well knew, the payments were tied to the volume of CGx samples the Marketers obtained.

44.   It was a further manner and means of the conspiracy that HURT regularly communicated with ECMC staff by text message and email, including via HURT's Verify email account, regarding ECMC's bank account balances and anticipated Medicare reimbursement amounts.   Likewise, HURT regularly directed ECMC staff to transfer Medicare reimbursements between ECMC's bank accounts, including its operating and laboratory accounts, and external bank accounts that HURT controlled, including bank accounts associated with First Choice and Fountain Health.

45.   It was a further manner and means of the conspiracy that HURT used the bank accounts associated with First Choice and Fountain Health to make millions of dollars in kickback payments to the Marketers.

46.   It was a further manner and means of the conspiracy that HURT and others used a portion of Medicare reimbursements obtained through the fraudulent submission of CGx claims to engage in monetary transactions in excess of $10,000.   For example, in and around October

2019, HURT transferred or caused to be transferred approximately $3,000,000.00 from the Fountain Health JP Morgan Chase account #XXXXX5511 for the purpose of making a payment toward the purchase of a luxury watercraft located in the Southern District of Florida, which HURT subsequently caused to be named "In My DNA."

47.     It was a further manner and means of the conspiracy that between in and around January 2019 and in and around October 2019, HURT caused Medicare to pay ECMC approximately $25,600,715.76 associated with approximately 53,866 fraudulent CGx claims submitted on behalf of 4,074 individual beneficiaries residing throughout the United States, including in the Western District of Pennsylvania, Southern District of Florida, and Middle District of Florida.   As a result of such fraudulent billing, HURT and others caused ECMC to exceed the 30% cap on the use of reference laboratories, in violation of federal law, and further caused ECMC's Medicare claims for CGx testing to omit the required modifier indicating the use of reference laboratories.

## **Overt Acts**

48.     In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Western District of Pennsylvania, at least one of the following overt acts, among others:

a.     On or about April 1, 2019, HURT caused ECMC to submit fraudulent claims totaling $16,927.64 for CGx testing related to L.B., a Medicare beneficiary who completed a cheek swab during an event at a senior center that was marketed as "free" genetic testing, resulting in Medicare reimbursements to ECMC of approximately $4,331.60, despite that L.B. never spoke with the physician identified on the claims.   The CGx testing was not reasonable or necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a

13

malformed body member.   The CGX test was procured through kickbacks paid and received by HURT.

      b.    On or about April 10, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $121,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

      c.    On or about April 10, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $97,254.43 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

      d.    On or about April 22, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $350,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

      e.    On or about April 29, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $150,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

      f.    On or about May 1, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $200,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

      g.    On or about May 6, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $420,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

      h.    On or about May 7, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $250,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

i.  On or about May 9, 2019, HURT caused ECMC to submit fraudulent claims totaling $14,127.64 for CGx testing related to G.R., a Medicare beneficiary who provided a cheek swab during a "health fair," resulting in Medicare reimbursements to ECMC of approximately $6,291.60, despite that G.R. did not know the referring physician identified on the claims.   The CGx testing was not reasonable or necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member.   The CGX test was procured through kickbacks paid and received by HURT.

j.  On or about May 13, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $182,300.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

k.  On or about May 16, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $600,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

l.  On or about May 16, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $250,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

m.  On or about May 23, 2019, HURT caused ECMC to submit fraudulent claims totaling $14,413.12 for CGx testing related to S.W., a Medicare beneficiary who completed a cheek swab that was mailed to S.W.'s home, resulting in Medicare reimbursements to ECMC of approximately $6,560.93, despite that S.W. never spoke with the referring physician identified on the claims.   The CGx testing was not reasonable or necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member.   The CGX test was procured through kickbacks paid and received by HURT.

n.      On or about May 24, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $750,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

o.      On or about May 24, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $250,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

p.      On or about May 30, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $1,150,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

q.      On or about May 7, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $350,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

r.      On or about June 5 and 6, 2019, HURT caused ECMC staff to initiate two funds transfers totaling $800,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

s.      On or about June 5, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $300,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

t.      On or about June 13, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $1,000,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

u.      On or about June 13, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $300,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

v.      On or about June 19, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $700,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

w.      On or about June 19, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $300,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

x.      On or about June 25, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $1,000,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

y.      On or about June 25, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $300,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

z.      On or about June 28, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $200,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

aa.     On or about June 28, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $150,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

bb.     On or about July 12, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $2,100,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

cc.     On or about July 12, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $500,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

dd.     On or about July 16, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $1,200,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

ee.     On or about July 16, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $300,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

ff.     On or about July 29, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $700,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

gg.     On or about June 29, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $400,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

hh.     On or about August 6, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $1,300,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

      ii.     On or about August 6, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $600,000.00 from the ECMC WesBanco account #XXXXX0036 to the First Choice JP Morgan Chase account #XXXXX7002.

      jj.     On or about September 6, 2019, HURT caused ECMC staff to initiate a funds transfer in the amount of $200,000.00 from the ECMC WesBanco account #XXXXX0036 to the Fountain Health JP Morgan Chase account #XXXXX5511.

      All in violation of Title 18, United States Code, Section 371.

## **FORFEITURE ALLEGATIONS**

49.     The allegations of this Information are re-alleged and by this reference fully incorporated herein for purposes of alleging criminal forfeiture

50.     The United States hereby gives notice to the defendant charged in Count One of this Information that, upon his conviction of such offense, the government will seek forfeiture of the following property, in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of such offense to forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense:

        a.      The watercraft "In My DNA" (Hull ID: VKY80704C616).

51.     If the above-described forfeitable property, as a result of any act or omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred, sold to, or deposited with a third party;

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be subdivided without difficulty,

the United States intends to seek forfeiture pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), of any other property of the defendant up to the value of the forfeitable property described in these forfeiture allegations.

CINDY K. CHUNG
United States Attorney
PA ID No. 317227

ERIC G. OLSHAN
Assistant United States Attorney
IL ID No. 6290382