IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Nos. 22-189; 22-224; 22-231 |
| | ) |
| DANIEL HURT | ) |

GOVERNMENT'S SENTENCING MEMORANDUM

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, First Assistant United States Attorney for the Western District of Pennsylvania, and William B. Guappone, Assistant United States Attorney for said District, and respectfully files the following Memorandum in Aid of Sentencing.

Defendant was the organizer of three health care fraud schemes that caused a combined loss to the United States of more than $97 million. Given the seriousness of the offenses and the need for general deterrence, as well as the other § 3553(a) factors, a term of imprisonment of 120 months is appropriate.

I.   PROCEDURAL BACKGROUND

On July 26, 2022, Defendant was charged by information with conspiring to commit offenses against the United States, in violation of 18 U.S.C. § 371. (Doc. 1).[1] Subsequently, Defendant consented to the transfer of two cases from other districts for purposes of plea and sentencing: a case out of New Jersey charging him by information with conspiring to commit health care fraud (2:22-cr-224 Doc. 2) and a case out of the Southern District of Florida, charging him by indictment with conspiring to commit wire fraud and conspiring to pay health care kickbacks (2:22-cr-231 Doc. 2).

---

[1] All references to docket entries in this memorandum refer to the docket number in 2:22-cr-189 unless otherwise noted.

1

On September 15, 2022, Defendant pled guilty to the Information from this district and the Information from the District of New Jersey, and to the conspiracy to pay health care kickbacks offense from the Southern District of Florida's Indictment. (Doc. 12). Sentencing on all three cases is set for April 30, 2024. (Doc. 51).

## II.     FACTUAL BACKGROUND

Because the undisputed facts are already laid out at length in the factual basis (Doc. 12-2) and the PSR, this memorandum only seeks to briefly summarize the relevant facts. Defendant pled guilty to his involvement in three separate conspiracies.

The first conspiracy chronologically is the one originally charged out of the Southern District of Florida. In 2014 and 2015, Defendant and others victimized Tricare (who provides civilian health care benefits for military personnel, military retirees, and military dependents) and CHAMP-VA (a health care benefit program run by the Department of Veteran's Affairs) in a scheme that involved the payment of illegal kickbacks. (Doc. 12-2 at 28-31). Defendant and others paid recruiters to solicit patients to receive medically unnecessary prescriptions for compounded medications.[2] (*Id.* at 29). Defendant himself was the signer on more than $1.7 million in illegal kickback payments to patient recruiters. (*Id.* at 30). Once the patient was enrolled, a medically unnecessary prescription was obtained through a telemedicine service in Utah, which was only paid when the prescription had actually been paid for by insurance. (*Id.* at 29-30). Often the prescriptions requested formulations that were specifically provided by the co-conspirators to maximize reimbursement from Tricare and CHAMP-VA, rather than formulations based on any true patient need. (*Id.* at 30). In all, the conspiracy caused a loss to Tricare of more than $18 million and to CHAMP-VA of more than $450,000.

---

[2] A compounded medication contains altered ingredients in order to meet the specific needs of an individual patient, such as the removal of an ingredient that a patient is allergic to. Because they are specialized, they are also reimbursed at a significantly higher rate than regular medications.

The second conspiracy is the one charged in this district, having occurred from late 2018 through October 2019. That scheme involved cancer genomic ("CGx") testing, which is genetic testing performed to see if an individual has a higher risk of developing certain types of cancers in the future. (*Id.* at 6). Defendant and his businesses paid marketers on a per-sample basis to obtain cheek swab specimens from Medicare beneficiaries, which payments were illegal kickbacks. (*Id.* at 8-10). Defendant then worked with telemedicine providers to get prescriptions for the already obtained cheek swab specimens, without regard to whether the telemedicine provider had ever seen the patient who provided the specimen or would ever use the resulting test results. (*Id.* at 10-11). The samples were then shipped to Ellwood City Medical Center ("ECMC") because ECMC's location enabled it to bill for CGx testing at a higher rate than other labs. (*Id.* at 11). In reality, the tests were performed by reference laboratories, not ECMC, which Defendant and ECMC concealed from Medicare. (*Id.* at 11). Defendant was then paid on a percentage (75%) of the resulting Medicare reimbursements to ECMC, which also represented an illegal kickback payment. (*Id.* at 11-12). Defendant attempted to conceal the nature of these payments, and the illegal kickback payments he made to marketers, by creating sham contracts to make it appear that the marketers were being paid for legitimate marketing service and Defendant was being paid for legitimate management services. (*Id.* at 12). In all, Medicare suffered a loss of more than $25 million from the scheme, based on 53,866 fraudulent CGx testing claims. (*Id.* at 13). At least $17.7 million of that money made its way from ECMC to one of Defendant's entities.

The third conspiracy, originally charged in New Jersey and running from January 2019 through October 2021, likewise involved kickback payments and CGx testing. There, too, Defendant paid kickbacks and bribes in exchange for referrals and orders for CGx testing for Medicare beneficiaries, without regard to medical necessity. (*Id.* at 20, 24-26). And Defendant similarly entered into sham contracts with the marketers who obtained the swabs, in order to

conceal the nature of the illegal kickback payments. (*Id.* at 26). In all, that scheme caused a loss to Medicare of at least $53.3 million, of which Defendant received at least $26.8 million. (*Id.* at 27).

### III.  THE PLEA AGREEMENT AND APPROPRIATE GUIDELINES

Neither party objects to the PSR's calculation of the Guidelines in this case, which match the parties' recommendations as agreed to in the plea agreement, and which the Court has adopted in its tentative findings. Defendant's base offense level is 6, which is increased by 22 levels because of the loss amount, by 4 levels because Defendant was convicted of a federal health care offense involving a government health care program and the loss exceeded $20,000,000, by a further 1 level because Defendant committed § 1957 money laundering, and by 4 more levels because Defendant was an organizer or leader of criminal activity that involved 5 or more participants. (*See* Doc. 34 at 3). Defendant's offense level should then be reduced by three levels for acceptance of responsibility, resulting in a total offense level of 34. (*Id.*). At criminal history category I, Defendant faces a Guidelines sentence of 151 to 188 months.

However, Defendant faces a maximum term of imprisonment of 5 years each in the Pennsylvania and Florida cases, and 10 years on the New Jersey case. While the Court could therefore run the sentences consecutively in the different cases to reach a Guidelines range of imprisonment, the parties have agreed to recommend that the sentences imposed in each case run concurrently. (Doc. 12-1 at ¶C.11).

The parties also agree on the appropriate financial penalties. Defendant consented to the forfeiture of a boat called, "In My DNA," which was sold in October 2023. (*Id.* at ¶A.7(a)). The proceeds of that sale are being held in an account maintained by defense counsel and, to the government's understanding, will be turned over to the government at or shortly after sentencing. Defendant also agreed to forfeiture money judgments of $26,883,480.70 (for the New Jersey case) and $4,625,144 (for the Florida case). (*Id.* at ¶A.7(b)-(c)). The parties also agreed to recommend

4

restitution amounts of $25,600,715.76 to the Centers for Medicare and Medicaid Services ("CMS") (for the Pennsylvania case), $53,319,506 to CMS (for the New Jersey case), and $18,440,230 to Tricare and $450,844 to CHAMPVA (for the Florida case).

Accordingly, if the Court were to follow the parties' recommendations as to restitution and the concurrent nature of the sentences, but otherwise sentence Defendant within the Guidelines range, the following would be applicable:

| Case Number | Term of Imprisonment | Forfeiture | Restitution |
|---|---|---|---|
| 2:22-cr-189 | 60 months (concurrent) | "In My DNA" proceeds ($4,489,077.32) | $25,600,715.76 (CMS) |
| 2:22-cr-224 | 120 months (concurrent) | $26,883,480.70 | $53,319,506 (CMS) |
| 2:22-cr-231 | 60 months (concurrent) | $4,625,144 | $18,440,230 (Tricare);[3] $450,844 (CHAMPVA) |

IV.   **A TERM OF IMPRISONMENT OF 120 MONTHS IS NECESSARY AND APPROPRIATE**

A. <u>The Nature and Circumstances of the Offense</u>

The losses in this case are staggering. Defendant was the leader of three schemes that caused a combined loss of more than $97 million to the United States. Of that amount, Defendant and his entities received at least $44.5 million. Earning the median American wage, it would take a worker more than 747 years to make that much money.[4]

As noted above, Tricare and CHAMP-VA got nothing for its expenditures. The prescriptions that the programs paid for were medically unnecessary, and therefore of no use.

---

[3] Defendant should receive credit towards this amount for any payment made by co-defendants in that case.
[4] *See Usual Weekly Earnings of Wage and Salary Workers, Second Quarter 2023,* https://www.bls.gov/news.release/pdf/wkyeng.pdf (last accessed February 23, 2024) (median weekly earnings in the fourth quarter of 2023 was $1,145).

5

Accordingly, almost $19 million that could have gone towards other medical services instead went to Defendant and his co-conspirators.

CMS also received nothing of value in return for the more than $78 million it spent on CGx testing related to the New Jersey scheme and the Pennsylvania scheme. The telemedicine providers involved in the schemes wrote prescriptions for CGx testing for patients regardless of whether the providers had ever seen the patients, much less treated them, and without regard for whether such test results were necessary or would ever be used. Once the results of the test came back, the providers did not go over the results with the patients. Accordingly, to the extent the patients were even made aware of the results, they would not have known how to parse the results, or what, if anything, they should do in response.

Any kickbacks scheme that results in such a sizeable loss is serious. *See United States v. Howard*, 28 F.4th 180, 206-208 (11th Cir. 2022) (noting that kickbacks schemes are serious because they incentivize doctors to write prescriptions they would not write if they were acting only in their patient's medical interests). This one is particularly so. Breaking the law was not a small portion of Defendant's businesses, it was the business model, and the way in which he made tens of millions of dollars. For example, the whole point of Defendant's relationship with ECMC, a partnership that made him more than ten million dollars, was to bill CGx tests, obtained through the use of kickbacks, through the company. Indeed, that relationship shows Defendant wasn't satisfied with the profits to be made from billing for unnecessary CGx testing at the normal rate. He ensured that the tests were billed as if ECMC's laboratory had performed the tests, even though ECMC's laboratory did not have the capability to run CGx testing, all in order to obtain a higher rate of reimbursement.

And Defendant wasn't just any participant in these schemes. He was the organizer and leader of all three schemes. That is, he orchestrated two different kinds of schemes (a CGx testing

scheme and a compound pharmaceutical scheme) across multiple states, over the course of 7 years. The Guidelines appropriately suggest that a defendant who leads conspiracies that cause such astounding losses to the government is deserving of a lengthy term of imprisonment. A sentence of ten years of imprisonment is sufficient but not greater than necessary to adequately reflect the nature and circumstances of the offenses at issue here.

    B.  <u>History and Characteristics</u>

Nothing in Defendant's history and characteristics lessens the need for such a serious sentence. Unlike so many of the defendants before the Court, Defendant enjoyed a stable, middle-class childhood. (PSR ¶163-165). He is quite apparently a smart and capable businessman: he has undergraduate and law degrees (*Id.* ¶178) and has lived a variety of successful lawful professional lives, including by participating in legal work and house flipping (*Id.* ¶179-183). Defendant could have lived a comfortable life without engaging in the instant offenses. Instead, he chose to commit a series of frauds on his own country, causing enormous losses.

    C.  <u>Deterrence of Others</u>

Here, as in all white-collar cases, deterrence is an essential element of any sentence. As this case demonstrates, would-be health care fraudsters can make incredible financial gains in a short period of time. For example, in the span of a few months, Defendant earned millions of dollars based on the ECMC scheme. The allure of such ill-gotten gains is readily apparent.

Because health care fraud schemes are difficult to catch, and the requisite proof of intent is hard to come by, most health care fraud offenders get away without a criminal conviction. For example, in fiscal years 2018-2022, there were only between 330-431 health care fraud offenders convicted in each year, with a median loss of around $1.3 million. *Quick Facts: Health Care Fraud Offenses*, <u>United States Sentencing Commission,</u> available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-

facts/Health_Care_Fraud_FY22.pdf (last accessed February 23, 2024). Such numbers pale in comparison to the total losses from health care fraud, with conservative estimates placing the amount at 3% of total health care expenditures, or approximately $100 billion. *The Challenge of Health Care Fraud*, National Health Care Anti-Fraud Association, available at https://www.nhcaa.org/tools-insights/about-health-care-fraud/the-challenge-of-health-care-fraud/ (last accessed March 19, 2024).

Given the potential for offenders to receive astounding amounts of ill-gotten gains, and the small chance that offenders will be caught, it is critical that courts send a message that such offenses are serious and are met with commensurate terms of imprisonment. Indeed, white-collar criminals are perhaps most susceptible to deterrence for at least two reasons. First, white-collar crimes frequently, as in the offenses in this case, require the defendant to know what they are doing is wrong, and choose to do it anyways. In such cases where criminals have to make considered decisions about whether to engage in fraud, knowledge of potential consequences could have an impact in the would-be criminal's decision. *See United States v. Dougherty*, 98 F. Supp. 3d 721, 728 (E.D. Pa. 2015) (noting that economic crimes are prime candidates for general deterrence because they are the result of a rational process, rather than sudden passion). Here, Defendant made the decision, over and over for years, to engage in behavior he knew to be unlawful because it was exceedingly profitable for him. Knowledge that a significant term of imprisonment is waiting will be likely to deter other would-be offenders for whom no amount of potential gain is worth a chance at spending ten years in prison.

Second, white-collar offenders frequently have other, legal, options for how to obtain money. For example, Defendant here could have had a successful and comfortable lifestyle without engaging in any of the crimes at issue here. His choice was between acting within the bounds of

the law or living a life of luxury. A significant sentence of incarceration here is likely to deter the next potential offender, who will see that no number of yachts is worth ten years in federal prison.

D. Restitution and Forfeiture

Based on the most recent financial disclosures provided by Defendant, he lacks sufficient assets to immediately pay the agreed-upon restitution amount and forfeiture money judgments. Both parties agree that all of Defendant's assets should go to the government. All that's left to determine is how, mechanically, that should happen.

As noted above, the proceeds from the sale of "In My DNA" are subject to forfeiture. To the extent Defendant has not provided those proceeds to the government in advance of sentencing, the government will ask them to be wired to the government as soon as possible after sentencing.

As for the remainder of Defendant's assets, it appears that Defendant is working on a civil settlement with another arm of the government that may be completed before sentencing, and would dispose of all or nearly all of his assets. If that settlement has not concluded, the parties will present a plan to the Court on how to dispose of the remaining assets.

E. Other Considerations

In addition to the factors discussed above, other § 3553(a) factors, including the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, all advocate for a 120-month term of imprisonment in this case.

Respectfully submitted,

TROY RIVETTI
First Assistant United States Attorney[5]

/s/ *William Guappone*
WILLIAM GUAPPONE
Assistant United States Attorney
NC ID No. 46075

---

[5] Attorney for the United States, Acting under Authority Conferred by 28 U.S.C. § 515.