IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Nos. 22-189; 22-224; 22-231 |
| | ) | |
| DANIEL HURT | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, First Assistant United States Attorney for the Western District of Pennsylvania, and William B. Guappone, Assistant United States Attorney for said District, and respectfully files the following Response to Defendant's Sentencing Memorandum.

Defendant's publicly filed sentencing memorandum offers five main arguments for a sentence "significantly below the Guidelines range": (1) the amount of money Defendant will pay in restitution; (2) an inapplicable Guidelines amendment; (3) the absence of a need for specific deterrence; (4) purported sentencing disparities; and (5) generic arguments against lengthy sentences of imprisonment in white collar cases. Each argument merits a brief response.[1]

I. **Defendant's Forthcoming Payment of Restitution Does Not Warrant a Below-Guidelines Sentence**

Defendant first argues that he should receive a below-Guidelines sentence because he has made "extraordinary efforts to position himself to immediately pay meaningful restitution." (2:22-cr-231 Doc. 46 p. 5.).[2] Defendant has two facts upon which he rests his argument that his efforts to pay restitution are extraordinary: (1) he agreed in his plea agreement to pay restitution based on

---

[1] The government will respond to the sealed portions of Defendant's sentencing memorandum at the sentencing hearing.
[2] All of the relevant filings were submitted in each of the three cases. For ease of reference, all references to docket entries in this response are references to the docket in 2:22-cr-231.

1

the full loss caused by his schemes, not just his personal profit; and (2) he is liquidating all his assets to pay his debt to the government. (*Id.* at 1-2, 4-6, 21-23.). Neither represents such an extraordinary effort that it warrants a lower sentence.

Defendant's agreement to pay restitution based on the full loss caused by his schemes is merely consistent with the statutorily required restitution and the terms of his plea agreement. Restitution is appropriate for all losses that a defendant directly caused or knew about, or were reasonably foreseeable to occur. *United States v. Hilliard*, 823 Fed. Appx. 80, 84 (3d Cir. 2020). Here, plainly, the full amount of loss from the schemes Defendant was an organizer and leader of were directly caused by Defendant. Accordingly, restitution for the full amount of the losses is appropriate, and unexceptional.

Defendant's forthcoming agreement to liquidate his assets to pay his debt to the government likewise falls short of an extraordinary effort at restitution. Defendant cites to two cases in which a downward departure based on extraordinary efforts at restitution were granted. In one case, the defendant voluntarily began making restitution almost a year before he was indicted, and worked sixteen-hour days to earn additional funds for the government. *United States v. Oligmueller*, 198 F.3d 669, 672 (8th Cir. 1999). In the other, the defendants took out "enormous loans" to ensure they could fully pay restitution at sentencing. *United States v. Kim*, 364 F.3d 1235, 1245 (11th Cir. 2004) (noting that extraordinary restitution is "merely a discouraged factor on which to depart downward" not a forbidden factor).

Here, in attempting to assess Defendant's assertion that he plans to pay all assets to the government, the undersigned is limited by not having received a copy of the proposed settlement agreement. In any event, unlike the defendant in *Oligmueller*, Defendant did not make any restitution payments before being charged, and has still not made any payments towards his restitution obligation. And unlike the defendants in *Kim*, Defendant has not made extraordinary

efforts to obtain additional funds for the government, beyond assets he already owned. Instead, he has continued to live a lavish lifestyle while awaiting sentencing including by, among other things, spending $3,500 a month in groceries for himself and his son for whom he shares custody.

## II. Amendment 821 is Not Applicable

Defendant notes that "both parties agreed on the relevant Guidelines range as part of Mr. Hurt's plea agreement." (Doc. 46 pg. 3). And Defendant did not object to the PSR's calculation of the Guidelines. (Doc. 32). At the same time, however, Defendant argues that he is eligible for a two-level reduction in his offense level pursuant to Amendment 821 (and Guidelines § 4C1.1). (Doc. 46 at 9-10).

§ 4C1.1 of the Sentencing Guidelines provides for a two-level reduction in offense level for an offender who, among other things, "did not receive an adjustment under § 3B1.1 ***and*** was not engaged in a continuing criminal enterprise." (emphasis added). Under the plain language of the provision, Defendant is not eligible for such a reduction, because he received an adjustment under § 3B1.1. While Defendant offers a tortured alternative interpretation of § 4C1.1, he fails to cite to a single case that has adopted his reasoning. Indeed, courts have repeatedly noted that an adjustment under § 3B1.1, on its own, renders a Defendant ineligible for a decrease in offense level under § 4C1.1. *See, e.g., United States v. Zorilla*, 2024 WL 1603644, at *2 (S.D. FL. April 12, 2024); *United States v. Tovar-Zamorano*, 2024 WL 1557612, at *2 (D. KS April 10, 2024). Accordingly, Defendant is ineligible for a reduction in his offense level under § 4C1.1.

Defendant argues that, even if he is ineligible, the logic of § 4C1.1 supports a below-Guidelines sentence. In fact, the opposite is true: the Guidelines Commission considered whether offenders with no scoring criminal history should receive a reduction in their Guidelines sentence, determined many such offenders should receive such a reduction, but specifically exempted individuals like Defendant from such a reduction. In other words, after thoughtful consideration,

3

it was determined that ringleaders of criminal groups, like Defendant, should not get a bonus reduction in their Guidelines sentence because they were not convicted of crimes before embarking on criminal schemes they organized and directed. The Court should follow this sound logic and should not give Defendant an additional benefit for his lack of criminal history, beyond the benefit the Guidelines already give him in categorizing him as a criminal history category I offender.

### III. Defendant's Argument Regarding Specific Deterrence is Not a Sufficient Basis for a Variance

Defendant contends that he "is unlikely to reoffend and a guidelines sentence is not necessary to deter him from future misconduct." (Doc. 46 at 8-9). In support of this argument, Defendant points out that he has a lengthy history of employment, that he is a first-time offender, and that he is 59 years old. (Doc. 46 at 8-9). Defendant's touting of his employment history is bold, since for most of the past decade his work was running businesses he used to defraud the government of tens of millions of dollars. That Defendant is a first-time offender is also of limited moment, in part because it is a procedural benefit of his plea agreement. If Defendant's three cases had proceeded separately, he would have likely been a criminal history category III by the time of the third case's sentencing. Instead, he receives credit for his lack of prior criminal convictions by being in category I and accordingly receiving a lower Guidelines sentence at this joint sentencing hearing. No further reduction based on his lack of criminal history is warranted.

At best for Defendant, his case for a lower sentence based on specific deterrence is no different than the vast majority of white-collar offenders the Court sees. Accordingly, his argument is effectively that all white-collar defendants should receive lower sentences, as addressed *infra* Part V.

### IV. Defendant's Cherry-Picked Sentences are Irrelevant

As Defendant notes, a sentencing judge must make an "individualized assessment" of the Defendant before him at sentencing. (Doc. 46 at 4). Nevertheless, in arguing for a lower sentence,

4

Defendant picks a few below-Guidelines sentences and argues that they support the imposition of a reduced sentence for Defendant. (Doc. 46 at 17-21). Courts "should not consider sentences imposed on defendants in other cases in the absence of a showing" that the other defendants' circumstances "exactly paralleled" those of the defendant. *United States v. Lacerda*, 958 F.3d 196, 215 (3d Cir. 2020). Defendant has fallen far short of showing that any other defendant's circumstances exactly parallel his own.

Individual sentences are generally impossible to divine any information of value from. In large part, this is because most of the relevant documents are under seal, limiting the record from which future parties are able to determine the reasons for any given sentence. Defendant's own memorandum shows this to be true, as he spends an entire page attempting to recreate the Guidelines calculation in another case. (Doc. 46 at 18-19). Defendant's citation to Ravitej Reddy's case is another good example of how we are left to guess in trying to analogize other sentences to the instant matter. Mr. Reddy's publicly filed sentencing memorandum there emphasized "the extraordinary level of cooperation" he demonstrated, asserting that Mr. Reddy's cooperation led to the prosecution of several other individuals and companies across at least 9 federal districts. (2:19-cr-357 Doc. 68 pg. 1-2). If true, such cooperation could have had a significant impact on Mr. Reddy's sentence. But the public record is silent on whether the government moved for a reduction in Mr. Reddy's sentence under § 5K1.1, and whether and to what extent the Court relied upon Mr. Reddy's purported cooperation in providing a below-Guidelines sentence.

Accordingly, rather than counter Defendant's cherry-picked cases with cherry-picked cases of its own, the government asks the Court not to guess at the facts and circumstances underlying other sentences, and instead to make an individualized determination of an appropriate sentence

for Defendant. Here, 120 months of imprisonment is an appropriate sentence based on all the facts and circumstances known to the parties and the Court.

  V. **Defendant's Generic Arguments against Significant White-Collar Sentences Ring Hollow**

Defendant's main argument for a reduced sentence is that the Guidelines, in particular § 2B1.1, provide ranges for sentences that are at odds with the purposes of sentencing. (Doc. 46 at 12). There are judges that believe that Guidelines for white-collar offenders are too high, and judges that believe that the Guidelines appropriately punish white-collar offenders.[3] Wherever the Court falls on that spectrum, the undersigned acknowledges that the Court's opinion is unlikely to be swayed by one sentencing memorandum. Still, a few points in Defendant's memorandum warrant a response.

First, with respect to the need for general deterrence, the government refers the Court back to the discussion in its initial sentencing memorandum. (Doc. 45 at 7-9). In arguing against a need for general deterrence Defendant cites to a 2006 article, which dealt with whether three-strikes laws and mandatory minimums led to general deterrence, and is therefore of little value in the white-collar context. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28-29 (2006).[4] Other studies of deterrence are mixed in their findings. *See* Daniel S. Nagin, Annual Review of Economics Vol. 5, *Deterrence: A Review of the Evidence by a Criminologist for Economists*, 86-88 (2013) (summarizing studies including a study finding substantial deterrent

---

[3] Defendant repeatedly asserts that there is a "consensus" that § 2B1.1 leads to too high of Guidelines ranges. (Doc. 46 at 15-17). But the sentencing data do not bear that out. As noted in the 2023 Guidelines sourcebook, of the offenders convicted under § 2B1.1, 1,840 received sentences within or above the Guidelines, and 2,302 received a downward departure or variance, with the remainder receiving departures under § 5K1.1 or § 5K1.3. U.S. SENTENCING COMMISSION, 2023 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/2023_Sourcebook.pdf p. 67. In other words, the number of defendants receiving below-Guidelines sentences is a majority, but far from an overwhelming one.

[4] Defendant also cites to an article whose takeaway is that "the Sentencing Commission manages to pull ahead" in an analysis of whether the Guidelines are appropriate for white-collar offenders or, contrary to the Commission's suggestions, sentences should be decreased. Mihailis E. Diamantis, *White-Collar Showdown*, 103 Iowa L. Rev. Online 320, 334 (2017).

effects from using imprisonment to enforce fine payments and conditions of probation, as well as other deterrence studies with conflicting results).

The empirical evidence neither clearly establishes, nor refutes, the theory presented in the government's sentencing memorandum regarding white-collar deterrence. This is likely because there are so many factors that make a statistical analysis of deterrence in the white-collar setting nearly impossible including: (1) there is a substantial lag in white-collar cases between when crimes are committed and when they are charged, meaning a reduction in white-collar offenses would not be seen in a reduction in charges for years; (2) white-collar crime is so widespread relative to the number of cases brought that, for example, a 10% decrease in the number of federal fraud crimes committed would likely not result in any reduction in the amount of cases brought – law enforcement would just reallocate its resources; and (3) there are few major changes in white-collar sentencing (on the level of three-strikes laws or mandatory minimums) that could form a basis for a good before-and-after study. In the absence of definitive empirical evidence, courts are left to rely on common sense. For the reasons laid out in the government's initial sentencing memorandum, common sense supports a finding that white-collar criminals, who carefully plot their schemes with knowledge of their illegality, will be deterred by significant sentences of imprisonment.

Next, in arguing that white-collar sentences are too high, Defendant compares the Guidelines range applicable to Defendant to that faced by various hypothetical violent criminals, with the implication that Defendant should not receive as significant of a sentence as these hypothetical defendants. (Doc. 46 at 13-15). As Defendant aptly notes, however, this is a comparison of "apples-to-oranges," comparing two completely different things. (*Id.* at 15). Comparing apples-to-apples, or Honeycrisp-to-Gala at least, the Guidelines treat white-collar offenders similarly throughout, § 2B1.1 is not an outlier. For example, the loss table used in tax

7

cases, found at § 2T4.1, is broadly similar to the fraud table at § 2B1.1. Likewise, even those white-collar offenses that aren't directly sentenced under § 2B1.1 are often referred to its loss table, ensuring like offenders are treated alike. *See* §§ 2N2.1, 2N3.1, 2S1.1(a)(2), 2S1.3(a)(2).

Finally, Defendant points to a number of statistics regarding actual sentencing practice, including reference to 2015-2019 Guidelines Sourcebooks statistics and percentages. (Doc. 46 at 16). Specifically, as Defendant notes "median sentences imposed on fraud offenders in 2015-2019 were 12, 15, and 16 months, [] 45-50% below the low end of the Guidelines range." Barry Boss and Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 OHIO ST. J. OF CRIM. LAW 605, 622 (2021). Notably, this statistic includes cases where the defendant received a departure under § 5K1.1 or § 5K1.3. So, the median sentence imposed on fraud offenders who do not receive such a departure is closer, on average, to the Guidelines range. Moreover, because the Guidelines range for the average offender under § 2B1.1 is relatively low (the median loss amount in such convictions was $200,000 in 2023)[5], even a 50% reduction in a typical case would lead to a sentence of imprisonment one year shorter than that suggested by the Guidelines.[6] Defendant's Guidelines range is 151-188 months. The government asks for a sentence of 120 months, or 31 months below the low-end of the Guidelines.

                                      Respectfully submitted,

                                      TROY RIVETTI
                                      First Assistant United States Attorney[7]

                                      /s/ *William Guappone*
                                      WILLIAM GUAPPONE
                                      Assistant United States Attorney
                                      NC ID No. 46075

---

[5] 2023 SOURCEBOOK at 132.

[6] The statistics Defendant cites, of course, all predate the zero-point offender reduction. It is likely that courts were providing lower sentences, in part, because of similar logic to the reasoning underlying the zero-point offender reduction. Accordingly, with the implementation of the zero-point offender reduction, it is likely that sentences under § 2B1.1 will adhere closer to the Guidelines range moving forward because the Guidelines have shifted downwards.

[7] Attorney for the United States, Acting under Authority Conferred by 28 U.S.C. § 515.